UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

MARTIN L. OAKES,

               Petitioner,          **DECISION AND ORDER**

    -vs-                    **No. 10-CV-0318(MAT)**

JAMES CONWAY, Superintendent,
Attica Correctional Facility,

               Respondent.
_____

## I.   Introduction

Martin Oakes ("Oakes" or "Petitioner") has filed a <u>pro</u> <u>se</u> 28 U.S.C. § 2254 habeas corpus petition, alleging that he is being held in state custody in violation of his federal constitutional rights. He is incarcerated at Attica Correctional Facility as a result of a January 29, 2007 judgment of conviction in Steuben County Court, following a jury trial, on charges of first degree manslaughter, for which he was sentenced to a determinate prison term of 22 years.

## II.  Factual Background and Procedural History

On the evening of December 5, 2005, Petitioner, Danny Larrow ("Larrow" or "the victim"), Ryan Stilts ("Stilts"), Chris Cervoni ("Cervoni"), Jack Kemp ("Kemp"), George Barkley ("Barkley"), Kathy Smith ("Smith"), and Julie Hunt ("Hunt") were partying at the apartment of Scott Rose ("Rose") in the Village of Bath. Petitioner and Larrow had been drinking heavily and were both intoxicated. Petitioner was been drinking vodka and Kool-Aid, whiskey, and a

six-pack of beer. Petitioner had also been taking hits from a bowl of marijuana that was being passed around.

At about 7:00 or 8:00 p.m., Petitioner and Larrow had gone to the Kemp's apartment in the same building complex. Larrow began insulting Petitioner and the two men screamed at each other. At some point during the argument, Petitioner punched Larrow in the face, and Larrow threw Petitioner to the ground and kicked him. Stilts and other individuals broke up the fight, and Larrow left the area while Petitioner remained with Stilts for about an hour. During that time, Petitioner pulled out his knife, and informed Smith that he wanted to stab Larrow. Smith told Petitioner to put the knife away. Petitioner held the knife for a few minutes and eventually put it back in his pocket.

When Larrow returned to Kemp's apartment, Petitioner was in the hallway outside Kemp's apartment. At some point, both Larrow and Petitioner were in the hallway together, and they began punching each other and fighting on the floor. Larrow had no weapon. Hunt saw Petitioner take his knife out of his pocket and stab Larrow with it. The struggle ended with Larrow lying on the floor bleeding, having sustained stab wounds to his chest and stomach. As Petitioner stood up, Smith asked him what happened. Petitioner replied, "I stabbed Danny."

Petitioner looked around for his knife but could not find it. He then left the apartment building. Larrow announced to the

others, "[D]ude stabbed me!" Stilts tried to stop the bleeding and administered CPR to Larrow, who had stopped breathing. Stilts ordered someone to call for help, and Smith called 911.

Sergeant Lester Brown and Police Officer Stephen Hawken responded to the apartment building where they observed Larrow lying in the floor of a hallway. He appeared to be deceased; he was lying in a pool of blood, his eyes were half open and glazed, and he had no pulse. The officers saw a knife on a step in the hallway, three or four feet away from Larrow's body. The knife was covered in blood.

After Petitioner left the building, Daniele Lockard ("Lockard") saw him near a pay telephone. Since Petitioner appeared to be intoxicated and Lockard wanted cash so she could buy alcohol, she approached Petitioner and asked him for some money. Petitioner told her, "I just killed somebody and I don't know what to do." Petitioner told Lockard that the dead body was behind a nearby car wash. Lockard searched the car wash but found no one there.

At about 9:00 p.m., Petitioner went to the home of his girlfriend, Edwina Bates ("Bates"). Bates could smell alcohol on Petitioner's breath and observed blood on his shirt and in his hair. Petitioner told Bates that he had been fighting with Larrow and stabbed him in the chest. According to Barbara Bulkley ("Bulkley"), who was also in Bates's apartment, Petitioner appeared to be bragging about the incident. He commented, "I stuck the

fucking cock sucker and twisted it." When Bates asked Petitioner why he had stabbed Larrow, Petitioner said that it was because he had gotten tired of Larrow making fun of Petitioner's teardrop tattoo. Petitioner told Bates that he knew he was in trouble and was going to go to jail.

Investigator David Dubois ("Inv. Dubois"), who was familiar with both Petitioner and Larrow, went to crime scene. He observed Larrow's body and learned that Petitioner had been accused of stabbing him. After trying to locate Petitioner at his home, Inv. Dubois and several other officers went to Bates's home, where they found Petitioner.

As Inv. Dubois entered the apartment, he introduced himself to Petitioner, who stated that he knew Dubois. Petitioner then announced, "[H]e jumped me first." When Inv. Dubois asked Petitioner who he was talking about, Petitioner replied that Larrow had been making fun of his tattoos, and so Petitioner stabbed him.

Inv. Dubois told Petitioner that he wanted to talk to him at the police station, and Petitioner agreed. Before commencing the interview at the police station, Inv. Dubois administered the Miranda warnings, and Petitioner waived his rights. Petitioner said that he had gone to an apartment on West Morris Street to find someone named Chad who owed him $50. Petitioner said he saw a group of friends, and he began drinking with them. Petitioner said that Larrow, who also was drinking beer, had picked on him because of

-4-

his tattoos. Petitioner said that he "got sick of it and just snapped and stabbed him and left." Petitioner told the police that he had removed the knife from his back pocket, held it against his arm, and stabbed Larrow in his torso.

Petitioner said that he had known Larrow for years and had previous conflicts with him, including problems when they were in jail together. Petitioner remarked that Larrow "was nothing but a pedophile anyway." Petitioner said that he wished he had not stabbed Larrow and that he hoped Larrow did not die. Inv. Dubois memorialized Petitioner's statement in writing, and gave Petitioner an opportunity to review it and make changes.

Because of errors in the first statement, a second statement was drafted, indicating that Petitioner was not sure where in the apartment building the stabbing had occurred. Petitioner signed both statements.

The jury returned a verdict acquitting Petitioner of second degree murder and third degree possession of a weapon. However, the jury convicted him of first degree manslaughter. On January 29, 2007, Petitioner was sentenced to a determinate prison term of 22 years.

On December 31, 2008, the Appellate Division, Fourth Department, unanimously affirmed the judgment of conviction, and on March 19, 2009, the New York Court of Appeals denied petitioner

permission to appeal. <u>People v. Oakes</u>, 57 A.D.3d 1425 (App. Div. 4th Dept. 2008), <u>lv.</u> <u>denied</u>, 12 N.Y.3d 786 (N.Y. 2009).

In this timely habeas petition, Oakes argues that (1) the trial court improperly denied the motion to suppress his statements to the police; (2) the trial court's <u>Sandoval</u>[1] ruling was improper; (3) the evidence was not legally sufficient to support the conviction; (4) the verdicts were repugnant; (5) the trial court improperly conducted an interview of a seated juror in Petitioner's absence; (6) the trial court improperly refused to excuse a seated juror on the grounds of bias; (7) he was denied the effective assistance of trial counsel; and (8) his sentence was excessive. For the reasons that follow, the petition is denied.

## III. Discussion

### A.   Erroneous Admission of Petitioner's Statements

Oakes claims, as he did on direct appeal, that the trial court improperly refused to suppress his statements to the police. The Appellate Division disagreed:

> The record of the suppression hearing establishes that defendant was not in custody when he made his initial statement to the police at the home of his girlfriend, and thus <u>Miranda</u> warnings were not required. "Because the initial statement was not the product of pre-Miranda custodial interrogation, the post-<u>Miranda</u> detailed confession given by defendant cannot be considered the fruit of the poisonous tree". The record of the

---

[1] <u>People v. Sandoval</u>, 34 N.Y.2d 371 (N.Y. 1974) (providing for a hearing to determine whether the prosecutor will be permitted to impeach a defendant's testimony with evidence of his prior criminal convictions or uncharged bad acts.

> suppression hearing further establishes that, although defendant was intoxicated at the time he made the statements, he "was not intoxicated to such a degree that he was incapable of voluntarily, knowingly, and intelligently waiving his <u>Miranda</u> rights[.]"

<u>People v. Oakes</u>, 57 A.D.3d at 1426 (internal quotations omitted). The Appellate Division's rulings were correct as a matter of federal law.

### 1. General legal principles applicable to habeas claims involving confessions

While the voluntariness of a habeas petitioner's confession is a question of law entitled to de novo review by a federal court, <u>Miller v. Fenton</u>, 474 U.S. 104, 112 (1985), the state court's factual findings "shall be presumed to be correct" in a federal habeas corpus proceeding. 28 U.S.C. § 2254(e)(1). This presumption applies to facts, such as the "length and circumstances of [an] interrogation" that underlie a state court's legal ruling. <u>Id.</u> at 112, 117; <u>see also Thompson v. Keohane</u>, 516 U.S. 99 (1995) (voluntariness of a confession is a question of law; findings regarding "what happened" are entitled to presumption of correctness); <u>Kuhlmann v. Wilson</u>, 477 U.S. 436, 460 (1986) (state trial court's factual finding that statements of petitioner were "spontaneous" and "unsolicited" was entitled to the presumption of correctness).

## 2. **Petitioner was not subjected to custodial interrogation.**

Warnings pursuant to Miranda v. Arizona, 384 U.S. 436 (1966), are required prior to the interrogation of a suspect who is in custody. Custodial interrogation is "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." Id.; see also Dickerson v. United States, 530 U.S. 428 (2000) (reaffirming Miranda). In determining whether a person is in custody, the reviewing court must determine "first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave." Thompson, 516 U.S. at 112.

Generally speaking, a suspect who has not been arrested is not considered "in custody" unless "law enforcement officials act or speak in a manner that conveys the message that they would not permit the accused to leave." Campaneria v. Reid, 819 F.2d 1014, 1021, n.1 (2d Cir. 1989). Courts also consider whether "a reasonable person in the suspect's shoes would have understood that his detention was not likely to be 'temporary and brief' . . . [and] whether a person stopped under the circumstances at issue would feel that he was 'completely at the mercy of the police.'" United States v. Newton, 369 F.3d 659, 675 (2d Cir. 2004) (quoting Berkemer v. McCarty, 468 U.S. 420, 437-38 (1984)). "[A]bsent an

-8-

arrest, interrogation in the familiar surroundings of one's own home is generally not deemed custodial." Id. at 675 (citing United States v. Mitchell, 966 F.2d 92, 99 (2d Cir. 1992)). For Miranda purposes, "interrogation" includes "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." Rhode Island v. Innis, 446 U.S. 291, 301 (1980).

Here, the testimony presented at the suppression hearing fully supported the Appellate Division's conclusion that Oakes was not in custody at the time he initially spoke to the police at the home of his girlfriend. The entry into Bates's house was clearly consensual. There was no display of force or coercion by the officers; no guns were drawn or displayed; and no orders were given to Petitioner or Bates. Upon entering the house, Inv. Dubois introduced himself to Petitioner, who announced–unprompted–that he was familiar with Inv. Dubois. Before Inv. DuBois could explain the reason for his visit, Petitioner immediately and spontaneously stated, "He jumped me first." H.10-11 (Citations to "H." followed by numerals refer to pages from the transcript of the suppression hearing.). When Inv. Dubois asked Petitioner to clarify to whom he was referring, Petitioner replied, "Danny [Larrow]. So I did what I had to do. I got tired of him harassing me about my tattoos, so

I did it." H.11.   Inv. Dubois asked Petitioner what he did, and Petitioner said, "I stabbed him in the chest." H.11.

Significantly, at the time Oakes blurted out his statements about Larrow, the police had not arrested him, nor had they said or done anything to restrict his movement or to suggest that he was being detained.   In fact, the record indicates that the investigators had not had an opportunity to explain the reason for their visit before Petitioner began speaking about the murder. Petitioner's decision to talk about the event at that time did not thereby place him in a custodial situation. See Miranda, 384 U.S. at 478 (""[a]ny statement given freely and voluntarily" is admissible, and "[v]olunteered statements of any kind are ... not affected by our holding today.") Given these circumstances, the Appellate Division properly concluded that Petitioner's statements were not in response to custodial interrogation or its functional equivalent. See Mitchell, 966 F.2d at 98-99 ("Mitchell welcomed the EPA representatives into his home and was cooperative. He willingly divulged information. Although the interview grew 'heated' at times, [the EPA official] engaged in no speech or actions which reasonably could be taken as intimidating, coercive, or restricting Mitchell's freedom of action. . . . [T]the circumstances described clearly are insufficient for a finding of custody.").

### 3. Petitioner's intoxication did not render his subsequent _Miranda_ waiver unknowing or involuntary

Determining the validity of a Fifth Amendment waiver involves a two-part inquiry. First, the court must decide whether the waiver was the "product of a free and deliberate choice rather than intimidation, coercion, or deception." _Moran v. Burbine_, 475 U.S. 412, 421 (1986). Second, the waiver must have been made with the "full awareness of the right being waived and of the consequences of waiving that right." _United States v. Jaswal_, 47 F.3d 539, 542 (2d Cir.1995) (citing _Moran_, 475 U.S. at 421). Determinations as to waiver must be made in light of the totality of the circumstances surrounding the interrogation, and so the court should assess the defendant's "characteristics, the conditions of the interrogation, and the conduct of law enforcement officials." _United States v. Anderson_, 929 F.2d 96, 99 (2d Cir. 1991); _see_ _also_ _Moran_, 475 U.S. at 421.

No single characteristic or trait is dispositive when deciding whether a valid waiver was executed, and "[e]ven evidence of a defendant's intoxication with alcohol or a controlled substance does not preclude a finding of a knowing and intelligent waiver provided that they appreciate the nature of the waiver." _Alvarez v. Keane_, 92 F. Supp.2d 137, 150 (E.D.N.Y. 2000) (citing _Avincola v. Stinson_, 60 F. Supp.2d 133, 160 (S.D.N.Y.1999) (valid waiver despite physical manifestations of drug use by defendant at the time _Miranda_ warnings were given); _United States v. DiLorenzo_,

-11-

94-CR-303 (AGS), 1995 WL 366377, at *8-9 (S.D.N.Y. June 19, 1995) (defendant who stated he understood his rights and signed waiver form made knowing and intelligent waiver despite allegedly being under the influence of alcohol)).

The record of the suppression hearing established that, while petitioner appeared to be intoxicated and admitted to drinking alcohol and smoking marijuana at various points during the day, petitioner appeared to be coherent, responsive to questions, and showed no signs of slurred speech. H.27, 68. Furthermore, petitioner never indicated to the police that he was having difficulty understanding the conversation or functioning because of intoxication. H.29-30, 36, 66, 72, 76. Based on this evidence, the state courts properly concluded that petitioner's intoxication did not prohibit him from knowingly, voluntarily, and intelligently waiving his <u>Miranda</u> rights, and petitioner has presented no evidence to the contrary. Therefore, the state court's factual findings on this issue must be presumed to be correct on federal habeas review. <u>See</u> 28 U.S.C. § 2254(e)(1); <u>Shields v. Duncan</u>, No. 02-CV-6713(JBW), 03-MISC-0066(JBW), 2003 WL 22957008, at *14 (E.D.N.Y. Oct. 20, 2003) ("Absent clear and convincing evidence to the contrary . . . the state court's decision that petitioner's degree of intoxication was not so great as to render him unable to execute a valid waiver of rights will be presumed to be correct.").

**B.    Erroneous _Sandoval_ Ruling**

Prior to the start of trial, the trial court conducted a hearing pursuant to People v. Sandoval, 34 N.Y.2d 371, supra, to determine whether the prosecutor would be permitted to impeach Petitioner's testimony with evidence of his prior criminal convictions. Over defense objections, the trial court ruled that, if Petitioner chose to testify, the prosecutor would be permitted to cross-examine him with respect to a November 14, 1991, conviction of Criminal Possession of a Forged Instrument in the Third Degree (N.Y. Penal Law § 170.20), and a November 22, 1992, conviction of Attempted Criminal Possession of a Forged Instrument in the Second Degree (N.Y. Penal Law §§ 110/170.25). Petitioner subsequently elected not to testify at trial.

Petitioner's claim that the trial court's Sandoval ruling was improper is not cognizable on federal habeas review because he did not testify at trial. Grace v. Artuz, 258 F. Supp.2d 162, 171-72 (E.D.N.Y. 2003) (citing Luce v. United States, 469 U.S. 38, 43 (1984). In Luce, the Supreme Court held, in the context of a direct review of a trial court's ruling pursuant to Rule 609 of the Federal Rules of Civil Procedure, that an evidentiary ruling allowing the prosecutor to impeach a defendant with a prior conviction is not reviewable on appeal unless the defendant testifies. Luce, 469 U.S. at 43 (holding that in order "to raise and preserve for review the claim of improper impeachment with a

-13-

prior conviction, a defendant must testify"). The defendant's "failure to testify makes it impossible to test the propriety of the ruling in order to weigh the probative value of a conviction as impeachment against its prejudicial effect. The reviewing court must know the precise nature of the defendant's testimony, which is unknowable when the defendant does not testify." Grace, 258 F. Supp.2d at 171-72.

Habeas courts in this Circuit have relied upon Luce to hold that in absence of the defendant taking the stand to testify at trial, a claim as to the impropriety of the Sandoval ruling does not raise a constitutional issue cognizable on habeas review. E.g., Carroll v. Hoke, 695 F. Supp. 1435, 1440 (E.D.N.Y. 1988) (holding that Sandoval claim not cognizable on federal habeas review where petitioner did not testify at trial), aff'd, 880 F.2d 1318 (2d Cir.1989); accord Cato v. Superintendent of Groveland Corr. Fac., 463 F. Supp. 2d 367, 372 (W.D.N.Y. 2006) (same); Brathwaite v. Duncan, 271 F. Supp.2d 400, 401 (E.D.N.Y. 2003) (same).

## C.   Insufficiency of the Evidence

Petitioner argues, as he did on direct appeal, that the evidence was not legally sufficient to support thes first degree manslaughter conviction because proof of intent was lacking due to his intoxication.   The Appellate Division held that Petitioner "failed to preserve . . . his contention that the evidence [was] legally sufficient to support the conviction." People v. Oakes, 57

-14-

A.D.3d at 1426. Respondent argues that Petitioner's insufficiency-of-the-evidence claim is procedurally barred because the Appellate Division relied upon an adequate and independent state law ground to dismiss it. Because the sufficiency-of-the-evidence claim is easily resolved on the merits, and because it is relevant to Oakes' repugnancy-of-the-verdicts claim, the Court has overlooked the procedural bar present here and reviewed the substance of the claim.

Under the clearly established law set forth in <u>Jackson v. Virginia</u>, 443 U.S. 307 (1979), a habeas petitioner "bears a very heavy burden" when challenging the legal sufficiency of his state criminal conviction. <u>Einaugler v. Supreme Court of the State of N.Y.</u>, 109 F.3d 836, 840 (2d Cir. 1997) (quotation omitted). A habeas court must defer to the assessments of the credibility of the witnesses that were made by the jury, and it may not substitute its view of the evidence for that of the jury. <u>Maldonado v. Scully</u>, 86 F.3d 32, 35 (2d Cir. 1996). A "federal habeas corpus court faced with a record of historical facts that supports conflicting inferences must presume–even if it does not affirmatively appear in the record–that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." <u>Wheel v. Robinson</u>, 34 F.3d 60, 66 (2d Cir. 1994), <u>cert.</u> <u>denied</u>, 514 U.S. 1066 (1995) (quoting <u>Jackson</u>, 443 U.S. at 326). After considering the trial evidence in the light most favorable to the prosecution,

the reviewing court must uphold the conviction if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson, 443 U.S. at 319 (emphasis in original).

In assessing a legal-insufficiency challenge, the reviewing court first must look to state law to determine the elements of the crime. Ponnapula v. Spitzer, 297 F.3d 172, 179 (2d Cir. 2002) (quotation omitted). To convict Oakes of first degree manslaughter, the prosecution was required to prove that he acted with intent to cause serious physical injury to Larrow and thereby caused Larrow's death. See N.Y. Penal Law § 125.20. The only issue Petitioner raises is whether, due to his intoxication, the evidence was legally sufficient to establish that he intended to cause Larrow serious physical injury when he stabbed Larrow in his chest.

Oakes is correct that a person's intoxication may negate the element of criminal intent, see N.Y. Penal Law § 15.25. "Although there was evidence at trial that defendant consumed a significant quantity of alcohol on the night of the incident, [a]n intoxicated person can form the requisite criminal intent to commit a crime, and it is for the trier of fact to decide if the extent of the intoxication acted to negate the element of intent[.]" People v. Martinez, 73 A.D.3d 1432, 1433 (App. Div. 4th Dept. 2010).

Here, while there was evidence that Petitioner was intoxicated at the time of the killing, the jury reasonably could have

concluded, and did conclude, that his level of inebriation did not negate his intent to cause Larrow serious physical injury. Smith testified that, prior to the incident, Petitioner took out his knife and said that he wanted to stab Larrow. In addition, Petitioner told the police that, during the final altercation with Larrow, he took out his knife and held it against his arm just before he stabbed Larrow with it. From that evidence, a rational jury readily could have concluded that Petitioner had consciously considered stabbing Larrow and then deliberately carried out that intended action.

Furthermore, the evidence of Petitioner's behavior immediately after the killing further established that, notwithstanding any intoxication, Petitioner was fully aware of what he had done. For example, moments after the stabbing, Petitioner informed Smith that he had, in fact, stabbed Larrow. After he left the apartment building, he told Lockard that he had just killed someone. When he arrived at Bates's apartment, Petitioner bragged to her and her friend that he had "stuck the fucking cock sucker and twisted it." Petitioner also explained that the reason he stabbed Larrow was because he had mocked Petitioner's tattoo. Petitioner went on to remark to Bates that he knew he was in trouble and was going to go to jail. Given Petitioner's ability, immediately after the killing, to repeatedly and consistently explain his behavior and the reasons for it, as well as his ability to understand that he was legally

culpable for what he had done, it was entirely reasonable for the jury to conclude that Petitioner, though intoxicated, was fully aware of what he was doing and acted with the requisite intent.

### D.   Repugnancy of the Verdicts

Petitioner claims that the jury's verdict convicting him of first degree manslaughter was repugnant to the acquittal on the third degree weapon's possession charge. It is well-settled that inconsistent jury verdicts (e.g., a conviction is inconsistent with the jury's verdict of acquittal on another count or where the verdicts treat co-defendants in a joint trial inconsistently), are constitutionally permissible, and do not present a question for federal habeas review. See United States v. Powell, 469 U.S. 57, 58, 64-65 (1984) (holding that "consistency in the verdict is not necessary" and noting that inconsistent verdicts are often the product of "mistake, compromise, or lenity") (citing Dunn v. United States, 284 U.S. 390 (1932)); see also Dowling v. United States, 493 U.S. 342 (1990) (stating that "inconsistent verdicts are constitutionally tolerable"); Harris v. Rivera, 454 U.S. 339, 345 (1981) (stating that "[i]nconsistency in a verdict is not a sufficient reason for setting it aside"). The Supreme Court has observed that a criminal defendant "already is afforded protection against jury irrationality or error by the independent review of the sufficiency of the evidence undertaken by the trial and appellate courts" and therefore "further safeguards against jury

irrationality" are not necessary. <u>Powell</u>, 469 U.S. at 67. As discussed above, Oakes' conviction on the charge of first degree manslaughter was amply supported by the evidence. Accordingly, Petitioner's repugnancy-of-the-verdicts claim is dismissed as not cognizable.

### E.   Denial of Sixth Amendment Right to Be Present

Petitioner argues that he was denied his right to be present at a material stage of the trial when the trial court conducted an <u>in camera</u> interview of a sworn juror in the presence of both counsel, but in Petitioner's absence. The Appellate Division held that Petitioner did not have a Sixth Amendment right to be present because the determination regarding "[w]hether a seated juror is grossly unqualified is a legal determination . . . , and as such the presence of counsel at a hearing to determine a juror's qualification is adequate." <u>People v. Oakes</u>, 57 A.D.3d at 1426 (citations omitted). This was not an unreasonable application of clearly established federal law.

"It is a well-settled principle of constitutional law that a criminal defendant has the right 'to be present at all stages of the trial where his absence might frustrate the fairness of the proceedings.'" <u>Cohen v. Senkowski</u>, 290 F.3d 485, 489 (2d Cir. 2002) (quoting <u>Faretta v. California</u>, 422 U.S. 806, 819 n. 15 (1975) and citing <u>Kentucky v. Stincer</u>, 482 U.S. 730, 745 (1987)). "[T]he impaneling of the jury is one such stage." <u>Tankleff v. Senkowski</u>,

135 F.3d 235, 246 (2d Cir. 1998); accord Gomez v. United States, 490 U.S. 858, 873 (1989)

"[T]he right to be present is not absolute: it is triggered only when the defendant's 'presence has a relation, reasonably substantial, to the fulness of his opportunity to defend against the charge.'" Cohen, 290 F.3d at 489 (quoting Snyder v. Massachusetts, 291 U.S. 97, 105–06 (1934)). Thus, a defendant does not have a constitutional right to be present "when [his] presence would be useless, or the benefit but a shadow." Id. at 106–07; accord Cohen, 290 F.3d at 489.

Under New York state law, a defendant is entitled to be present at sidebar discussions when the merits of the case are discussed or where "prospective jurors' backgrounds and their ability to weigh the evidence objectively" are discussed. People v. Antommarchi, 80 N.Y.2d 247, 250 (N.Y. 1992); see also Gaiter v. Lord, 917 F. Supp. 145, 151-52 (E.D.N.Y. 1996). However, "[f]ederal standards regarding a defendant's presence at a sidebar are less stringent than New York's standards." Nichols v. Kelly, 923 F. Supp. 420, 425 (W.D.N.Y. 1996). Indeed, the federal Constitution generally "does not require a defendant's presence at sidebar conferences." Gaiter v. Lord, 917 F. Supp. at 152; accord, e.g., Cameron v. Greiner, 119 Fed. Appx. 340, 342-43 (2d Cir. 2005); United States v. Feliciano, 223 F.3d 102, 111 (2d Cir. 2000) (noting that it had found no case "in which an appellate court has

found a structural defect where a defendant was present throughout but unable to hear a circumscribed portion of voir dire, and whose counsel was allowed to consult with him about the limited questioning outside his hearing"), cert. denied, 532 U.S. 943 (2001).

In any event, even if a federal right to be present at sidebar during jury selection existed, it is subject to waiver, provided that the waiver is knowing and voluntary. E.g., Cohen v. Senkowski, 290 F.3d at 491; Polizzi v. United States, 926 F.2d 1311, 1319 (2d Cir. 1991); accord, e.g., Morales v. Superintendent Dale Artus, No. 05 Civ. 3542(BSJ)(AJP), 2006 WL 3821488, at *18 (S.D.N.Y. Dec. 28, 2006). The waiver may be made by the defendant or by defense counsel. Polizzi v. United States, 926 F.2d at 1322). Waiver also may be found through the defendant's conduct, such as his failure to object to the sidebar procedure. Cohen v. Senkowski, 290 F.3d at 491, 492 (stating that "when a defendant is fully apprised of the nature of the [sidebar] procedure, makes no objection to the procedure, and has counsel present for the duration of the [sidebar procedure], a knowing waiver of the right to be present occurs").

Here, the record reveals that Oakes knowingly and unequivocally waived his right to be present on November 28, 2006, when the issue arose: After jury selection had been completed, but before opening statements had commenced, a sworn juror, Gloria

Moran, was brought into the court's chambers with the prosecutor and defense counsel. At the outset of the proceeding, Petitioner's attorney announced, "For the record, I've asked ["Petitioner] if he would want to be in chambers for this and he's waived [his right to be present]." Transcript dated November 28, 2006, at 3. After the colloquy between the court, the attorneys, and the juror, the court asked both counsel if there were any objections to Moran continuing as a juror. The prosecutor stated that he had no objections. Petitioner's attorney then stated, "I did explain to [Petitioner] what we would be doing up here and he indicated that he had no problem and I have no objection either" Id. at 11.

In sum, even assuming that Petitioner has stated a cognizable constitutional issue regarding his Sixth Amendment right to be present, habeas relief is not warranted because he knowingly waived that right through counsel.

### F.    Erroneous Failure of Trial Court to Dismiss Juror for Cause

Petitioner contends that the trial court erred in failing to sua sponte discharge juror Moran. The Appellate Division concluded that Petitioner "failed to preserve . . . his further contentions that the court erred in failing to discharge that juror." Id. Respondent argues that the claim is procedurally defaulted based upon the Appellate Division's reliance upon an adequate and independent state ground to dismiss it.

-22-

A habeas court may not review a federal issue when the latest state court's ruling on the claim rested upon "a state law ground that is independent of the federal question and adequate to support the judgment." Coleman v. Thompson, 501 U.S. 722, 729 (1991). Although only a "firmly established and regularly followed state practice" may be interposed by a state to prevent subsequent review of a federal constitutional claim, James v. Kentucky, 466 U.S. 341, 348-49 (1984), the New York procedural rule applied by the Appellate Division in Oakes's case–that parties must preserve a claim of trial error with a specific, timely objection to give the court the opportunity to rectify the alleged error–has been recognized as such a firmly established and regularly followed rule. See Garcia v. Lewis, 188 F.3d 71, 79-82 (2d Cir. 1999) (recognizing that New York has a well-established preservation rule that is regularly followed in a number of contexts). Because the Appellate Division invoked this adequate and independent state ground in denying Petitioner's claim concerning the trial court's failure to discharge the sworn juror, this Court is barred from considering the merits of that claim. See Velasquez v. Leonardo, 898 F.2d 7, 9 (2d Cir. 1990) (when a state court explicitly invokes a state procedural bar rule, federal habeas review is precluded).

To overcome this procedural bar and obtain federal review of his claim, Petitioner must demonstrate either (1) cause for the default and prejudice resulting from the alleged constitutional

error; or (2) that the failure to consider the federal claim will result in a fundamental miscarriage of justice (i.e., a constitutional error has probably resulted in the conviction of someone who is actually innocent). <u>Coleman v. Thompson</u>, 501 U.S. at 750; <u>see also</u> <u>Wainwright v. Sykes</u>, 422 U.S. 72, 81, 87 (1977); <u>Harris v. Reed</u>, 489 U.S. 255, 262 (1989).

Oakes has not attempted to show cause for the default or prejudice attributable thereto. Nor has he demonstrated that failure to consider that a constitutional error has resulted in the conviction of someone who is actually innocent, causing the habeas court's failure to consider the claim to be a fundamental miscarriage of justice. <u>See</u> <u>Harris v. Reed</u>, 489 U.S. 255, 262 (1989) (citations omitted); <u>accord Dretke v. Haley</u>, 541 U.S. 386, 393 (2004). Accordingly, Oakes's claim that the trial court erroneously failed to remove juror Moran from the panel is dismissed as subject to an unexcused procedural default.

## G.   Ineffective Assistance of Trial Counsel

Oakes claims, as he did on direct appeal, that trial counsel unreasonably failed to (1) present evidence at the suppression hearing to support his argument that Petitioner was intoxicated when he made his statements to the police; (2) secure Petitioner's presence at the in camera interview of the juror; and (3) call Edwina Bates, Petitioner's girlfriend, as a defense witness to establish that Larrow had threatened Petitioner's life within the

year prior to the killing. The Appellate Division held that "[c]ontrary to the further contention of [petitioner], we conclude that he received meaningful representation." People v. Oakes, 57 A.D.3d at 1426-27 (citing People v. Baldi, 54 N.Y.2d 137, 147 (N.Y. 1981)).[2] This was not an unreasonable application of clearly established federal law.

In order to prevail on a claim of ineffective assistance of trial counsel, a habeas petitioner must show that his counsel provided deficient representation and that petitioner's defense was prejudiced as a result. Strickland, 466 U.S. at 687. A defendant "must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" Id. at 689. "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." Id. at 690. As to the second prong, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional," or erroneous advice, the result of the trial would have been different. Id. at 694.

In the context of federal habeas review of a Strickland claim, "[t]he question 'is not whether a federal court believes the state

---

2

The Second Circuit has held that application of New York's ineffective assistance of counsel standard as explained in Baldi is not "contrary to" the federal standard for evaluating ineffectiveness claims, as articulated in Strickland v. Washington, 466 U.S. 668 (1984). Rosario v. Ercole, 601 F.3d 118 (2d Cir. 2010).

court's determination' under the <u>Strickland</u> standard 'was incorrect but whether that determination was unreasonable–a substantially higher threshold.'" <u>Knowles v. Mirzayance</u>, 129 S. Ct. 1411, 1420 (2009) (quoting <u>Schriro v. Landrigan</u>, 550 U.S. 465, 473 (2007)). "[B]ecause the <u>Strickland</u> standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard." <u>Knowles</u>, 129 S. Ct. at 1420 (citing <u>Yarborough v. Alvarado</u>, 541 U.S. 652, 664 (2004)).

Thus, federal habeas courts must apply "doubly deferential judicial review" to <u>Strickland</u> claims. <u>Id.</u> When Supreme Court precedent neither "squarely addresses" the issue nor gives a "clear answer to the question presented," the habeas court must give wide berth to the state court's conclusion that the petitioner failed to satisfy <u>Strickland</u>. <u>Wright v. Van Patten</u>, 552 U.S. 120, 125-26 (2008) (<u>per</u> <u>curiam</u>).

### 1. Counsel's Alleged Errors

#### a. Failure to Secure Petitioner's Presence at the <u>In</u> <u>Camera</u> Interview with a Juror

Petitioner contends that his attorney was ineffective because he failed to secure Petitioner's presence at the trial court's <u>in camera</u> interview of juror Moran. Petitioner has not demonstrated that trial counsel did not have a sound strategic reason for not insisting on his presence. Indeed, trial counsel could have concluded that including Petitioner in the conference might have made the juror uncomfortable and less likely to be forthcoming with

the court. <u>United States v. Peterson</u>, 385 F.3d 127, 138 (2d Cir. 2004) (finding that the trial judge <u>ex</u> <u>parte</u> meeting with a juror did not deprive defendants of any constitutional right or statutory right, for in the defendants' absence, the judge was able to speak candidly with the juror and ascertain the extent of juror misconduct—the first step in a fair and just hearing; had defendants been present, they could not have assisted and, indeed, their presence might have prevented the juror from speaking openly) (citing <u>United States v. Gagnon</u>, 470 U.S. 522, 526 (1985)(finding that the presence of defendants and counsel at an <u>in camera</u> inquiry of a sworn juror who expressed concern about defendant's sketching during the proceedings "could have been counterproductive")).

### b. Failure to Present Evidence at the Suppression Hearing Regarding Petitioner's Intoxication

Petitioner contends that trial counsel erred by not adducing evidence at the suppression hearing that Petitioner was intoxicated at the time he spoke with the police. This claim is belied by the record, since counsel did present such evidence. Trial counsel elicited from the police investigators that Petitioner told them during the interview that throughout the day, he had consumed a 12-pack of beer and smoked two bowls of marijuana. H.28, 35, 41, 69, 72. Trial counsel also elicited that Inv. Dubois, who had known Petitioner prior to his investigation of the Larrow slaying, recognized that Petitioner had been drinking. H.26-27, 42-43.

### c.   Failure to Call a Witness as to Prior Alleged Threats by the Victim

Finally, Petitioner argues that his attorney was ineffective because he failed to call his girlfriend, Bates, as a defense witness to establish that, at some point within the year preceding the crime, the victim, Larrow, had threatened Petitioner's life. Petitioner argues that had the evidence been introduced, the trial court might have instructed the jury to consider a justification defense.

Again, this claim is belied by the record. During the cross-examination of Bates, defense counsel attempted to elicit from Bates that she knew Larrow had threatened Petitioner. The trial court sustained the prosecutor's objection on hearsay grounds. Subsequently, defense counsel requested permission to re-call Bates as a defense witness so that she might testify as to Larrow's threats against petitioner. The prosecutor argued that the testimony should be precluded because it was not relevant.

After extensive oral argument, the trial court ruled that because Petitioner had no reasonable belief that Larrow was about to use deadly physical force against him at the time Petitioner stabbed Larrow, any testimony that Larrow had previously threatened Petitioner's life was irrelevant and the justification defense was not warranted on the proof. Thus, the record is clear that, contrary to Petitioner's contention, defense counsel did attempt to put evidence of the victim's alleged threats before the jury.

Despite his reasonable efforts, trial counsel was precluded from doing so by the trial court. That is not basis to find him ineffective, however. See United States v. DiTommaso, 817 F.2d 201, 215 (2d Cir. 1987) ("We will not second-guess trial counsel's defense strategy simply because the chosen strategy has failed.") (citations omitted).

In sum, Petitioner's claim that he was denied his Sixth Amendment right to effective representation is wholly without merit. As a result of counsel's zealous and effective advocacy, Petitioner was acquitted of one count (criminal possession of a weapons) and was only convicted of a much lesser charge (manslaughter) than the charge he originally faced (intentional murder). Petitioner's nitpicking criticisms do not establish ineffective assistance on counsel's part.

### H.   Harsh and Excessive Sentence

Petitioner argues, as he did in his appellate brief, that his sentence was excessive. The Appellate Division held that the sentence was "not unduly harsh or severe." People v. Oakes, 57 A.D.3d at 1427. Petitioner's claim is not cognizable on federal habeas review and must be denied.

When a sentence falls within the limits set by the state legislature, the prisoner's claim that his sentence is harsh and excessive does not present a basis for habeas corpus relief, as it does not present a federal constitutional question. See White v.

<u>Keane</u>, 969 F.2d 1381, 1383 (2d Cir. 1992) (holding that a state prisoner who was sentenced within the limits of the state law did not present a federal constitutional issue for habeas purposes); <u>see</u> <u>also</u> <u>Bellavia v. Fogg</u>, 613 F.2d 369, 373-74, n. 7 (2d Cir. 1979) (sentencing statute is properly the province of the state legislature and long mandatory sentence imposed pursuant to statute did not constitute cruel and unusual punishment).

Here, Petitioner's sentence on the first degree manslaughter count was within the limits set by the state legislature. Under New York's sentencing scheme, first degree manslaughter is classified as a class B violent felony. <u>See</u> N.Y. Penal Law §§ 125.20. Under N.Y. Penal Law § 70.00, the minimum sentence for a class B felony shall be not less than one year nor more than one-third of the maximum sentence, and the maximum sentence shall be twenty-five years. Petitioner's determinate prison sentence of twenty-two years was well within the statutory range, and his claim that the trial judge abused his discretion in sentencing does not present a federal question for review.

**IV. Conclusion**

Martin L. Oakes's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 is dismissed for the foregoing reasons. Because Oakes has failed to make a substantial showing of a denial of a constitutional right, the Court declines to issue a certificate of appealability. <u>See</u> 28 U.S.C. § 2253(c)(2).  The

Court hereby certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this judgment would not be taken in good faith and therefore denies leave to appeal in forma pauperis.

**SO ORDERED.**

**S/Michael A. Telesca**

_____
                        MICHAEL A. TELESCA
                  United States District Judge

DATED:       July 28, 2011
             Rochester, New York